**No. 14-1189**

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

FLAME S.A.,

*Plaintiff - Appellee,*

v.

FREIGHT BULK PTE. LTD.,

*Defendant - Appellant,*

Appeal from the United States District Court
for the Eastern District of Virginia
in Case No. 2:13-cv-00658-RGD-LRL
The Honorable Robert G. Doumar

## BRIEF FOR DEFENDANT-APPELLANT
## FREIGHT BULK PTE. LTD

Charles A. Rothfeld
Carmine R. Zarlenga
Richard Caldarone
Paul W. Hughes
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3000

March 25, 2014                    *Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Table of Abbreviations...................................................................ii

Table of Authorities ...................................................................iii

Introduction.................................................................................1

Statement of Jurisdiction ............................................................3

Statement of the Issues ...............................................................4

Statement of Facts .......................................................................4

Summary of Argument ..............................................................10

Standard of Review ...................................................................13

Argument...................................................................................13

I.     A U.S. Court Lacks Admiralty Jurisdiction To Enforce A Non-Maritime Judgment Of A Foreign Court ...........................................15

II.    The Contracts At Issue Are Not Maritime As A Matter Of U.S. Federal Law ....................................................................................25

      A.     Admiralty Jurisdiction Extends Only To Contracts That Have The Objective Of Maritime Commerce...........................26

      B.     FFAs Are Not Maritime Contracts.........................................28

           1.     FFAs have no connection to specific voyages or cargo and do not have the primary objective of furthering maritime commerce .......................................29

           2.     Prior decisions confirm that FFAs are not maritime in nature ................................................................................32

           3.     The district court's reasons for reaching the contrary conclusion are unpersuasive ...........................35

      C.     At A Minimum, This Case Should Be Remanded For The District Court To Determine Whether The FFAs In Issue Are Maritime...........................................................................37

Conclusion .................................................................................41

i

## TABLE OF ABBREVIATIONS

FBP:         Defendant Freight Bulk Pte. Ltd.

FFAs:        Forward Freight Agreements

ICI:         Industrial Carriers, Inc.

# TABLE OF AUTHORITIES

## Cases

*The Ada,*
　250 F. 194 (2d Cir. 1918) .......................................................... 34

*Adams v. Bain,*
　697 F.2d 1213 (4th Cir. 1982) .................................................. 15

*Aggelikos Prostatis Corp. v. Shun Da Shipping Grp. Ltd.,*
　646 F. Supp. 2d. 330 (S.D.N.Y. 2009) ...................................... 34

*Ahmed v. United States,*
　30 F.3d 514 (4th Cir. 1994) ..................................................... 13

*Alex v. Wild Well Control, Inc.,*
　2009 WL 2599782 (E.D. La. 2009) .......................................... 39

*Alphamate Commodity GMBH v. CHS Europe SA,*
　627 F.3d 183 (5th Cir. 2010) .................................................... 27

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.,*
　460 F.3d 434 (2d Cir. 2006) ..................................................... 15

*Aston Agro-Indus. AG v. Star Grain Ltd.,*
　2006 WL 3755156 (S.D.N.Y. 2006) ......................................... 34

*Athena Auto., Inc. v. DiGregorio,*
　166 F.3d 288 (4th Cir. 1999) .................................................... 39

*Barna Conshipping, S.L. v. 2,000 Metric Tons,*
*More or Less, of Abandoned Steel,*
　410 Fed. Appx. 716 (4th Cir. 2011) .......................................... 27

*Bergen Indus. & Fishing Corp. v. Joint Stock Holding Co.,*
　2002 WL 1587179 (W.D. Wa. 2002) ......................................... 21

*Blue Whale Corp. v. Grand China Shipping Dev. Co., Ltd.,*
　722 F.3d 488 (2d Cir. 2013) ............................................ *passim*

*In re Boston Reg'l Med. Ctr.,*
　410 F.3d 100 (1st Cir. 2005) .................................................... 39

*Brave Bulk Transp. Ltd. v. Spot on Shipping Ltd.*,
  2007 WL 3255823 (S.D.N.Y. 2007) ......................................... 36

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
  2010 WL 446529 (S.D.N.Y. 2010) ........................................... 30

*The Centurion*,
  5 F. Cas. 369 (D. Me. 1839) ................................................. 19

*Clem Perrin Marine Towing, Inc. v. Panama Canal Co.*,
  730 F.2d 186 (5th Cir. 1984) ................................................. 34

*CMH Homes, Inc. v. Goodner*,
  729 F.3d 832 (8th Cir. 2013) ................................................. 39

*Colonna's Shipyard, Inc. v. U.S.A.F. Gen. Hoyt S. Vandenberg*,
  584 F. Supp. 2d 862 (E.D. Va. 2008) ...................................... 34

*Consol. Bathurst, Ltd. v. Rederiaktiebolaget Gustaf Erikson*,
  645 F. Supp. 884 (S.D. Fla. 1986) .......................................... 35

*Crimson Yachts v. Betty Lyn II Motor Yacht*,
  603 F.3d 864 (11th Cir. 2010) ............................................... 39

*CTI-Container Leasing Corp. v. Oceanic Operations Corp.*,
  682 F.2d 377 (2d Cir. 1982) ................................................. 34

*Daimler AG v. Bauman*,
  134 S. Ct. 746 (2014) ........................................................ 24

*D'Amico Dry Ltd. v. Primera Mar. Ltd.*,
  2011 WL 3273208 (S.D.N.Y. 2011) ......................................... 21

*D'Amico Dry Ltd. v. Primera Maritime Ltd.*,
  2011 WL 1239861 (S.D.N.Y. 2011) ................................. *passim*

*EFKO Food Ingredients Ltd. v. Pac. Inter-Link SDN BHD*,
  582 F. Supp. 2d 466 (S.D.N.Y. 2008) ................................. 28, 34

*Exxon Corp. v. Cent. Gulf Lines, Inc.*,
  500 U.S. 603 (1991) .......................................................... 27

iv

*Farenco Shipping Co. v. Farenco Shipping Pte Ltd.*,
2012 WL 5614999 (E.D. La. 2012) ........................................ 29, 30, 32, 33

*Fitzgerald v. Racing Ass'n of Cent. Iowa*,
539 U.S. 103 (2003) ...................................................................... 23

*Flame S.A. v. M/V Lynx*,
Civ. No. 10-278, Dkt. No. 35 (E.D. Tex. Jun. 22, 2010) ......................... 36

*Flota Maritima Browning de Cuba v. Snobl*,
363 F.2d 733 (4th Cir. 1965) .......................................................... 34

*Folksam. Reins. Co. v. Clean Water of N.Y., Inc.*,
413 F.3d 307 (2d Cir. 2005) ........................................................... 28

*French Republic v. Fahey*,
278 F. 947 (D. Md. 1922) .............................................................. 35

*Great E. Shipping Co. v. Maritime Tankers & Shipping Co. Int'l Ltd.*,
631 F. Supp. 2d 392 (S.D.N.Y. 2009) ................................................ 34

*Hilton v. Guyot*,
159 U.S. 113 (1895) ..................................................................... 21

*In re Interbulk, Ltd.*,
240 B.R. 195 (Bankr. S.D.N.Y. 1999) ............................................. 4, 29

*Int'l Sea Food Ltd. v. Campeche*,
566 F.2d 482 (5th Cir. 1978) ...................................................... 18, 19

*Kossick v. United Fruit Co.*,
365 U.S. 731 (1961) ...................................................... 18, 24, 35, 40

*Lucky-Goldstar, Int'l (Am.) Inc. v. Phibro Energy Int'l, Ltd*,
958 F.2d 58 (5th Cir. 1992) ........................................................... 34

*Michigan v. Long*,
463 U.S. 1032 (1983) ................................................................... 23

*Miller v. Brown*,
462 F.3d 312 (4th Cir. 2006) .......................................................... 14

*Mulvaney v. Dalzell Towing Co.,*
90 F. Supp. 259 (S.D.N.Y. 1950) ............................................................... 35

*N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.,*
249 U.S. 119 (1919) ..................................................................... 26, 27, 39

*Nehring v. S.S. M/V Point Vail,*
901 F.2d 1044 (11th Cir. 1990) ................................................................ 27

*Noble Res. PTE. Ltd. v. Metinvest Holding Ltd.,*
622 F. Supp. 2d 77 (S.D.N.Y. 2009) ........................................................ 34

*Norfolk S. Ry. v. Kirby,*
543 U.S. 14 (2004) ...................................................................... *passim*

*North Carolina ex rel. Cooper v. Tenn. Valley Auth.,*
515 F.3d 344 (4th Cir. 2008) .................................................................... 13

*Penhallow v. Doane's Adm'rs,*
3 U.S. (3 Dall.) 54 (1795) ........................................................................ 19

*People's Ferry Co. v. Beers,*
61 U.S. 393 (1857) .................................................................................... 34

*Pioneer Freight Futures Company Limited v. Marine Trade S.A.,*
2011 U.S. Dist. LEXIS 157971 (C.D. Cal. 2011) .............................. 20, 33

*Polestar Mar. Ltd. v. Nanjing Ocean Shipping Co.,*
631 F. Supp. 2d 304 (S.D.N.Y. 2009) ...................................................... 34

*Primera Maritime Ltd. v. Jiangsu E. Heavy Indus. Co.,*
355 Fed. App'x 477 (2d Cir. 2009) ........................................................... 34

*Shanghai Sinom Import & Export v. Exfin (India) Mineral Ore Co.,*
2006 WL 4029953 (S.D.N.Y. 2006) .......................................................... 34

*Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.,*
585 F.3d 58 (2d Cir. 2009) ....................................................................... 23

*Sisson v. Ruby,*
497 U.S. 358 (1990) .................................................................................. 25

*Thames Towboat Co. v. Francis McDonald,*
254 U.S. 242 (1920) ................................................................ 27, 34

*Transfield ER Futures Limited v. The Ship 'Giovanna Iuliano'*
[2012] FCA 548 .......................................................................... 33, 36

*Transfield ER Futures Ltd. v. Deiulemar Shipping S.P.A,*
2012 123286 (E.D. La. 2012) .................................................... 36

*Trireme Mar. Co. v. Breakbulk Marine Servs. Ltd.,*
2009 WL 424352 (S.D.N.Y. 2009) .......................................... 35

*U.S. ex rel. Carter v. Halliburton Co.,*
710 F.3d 171 (4th Cir. 2013) ..................................................... 40

*United Transp. Union v. S.C. Pub. Ry. Comm'n,*
130 F.3d 627 (4th Cir. 1997) ..................................................... 13

*Univ. of R.I. v. A.W. Chesterton Co.,*
2 F.3d 1200 (1st Cir. 1993) ....................................................... 39

*Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,*
825 F.2d 709 (2d Cir. 1987) ...................................................... 14

*Village of Bald Head Island v. U.S. Army Corps of Eng'rs,*
714 F.3d 186 (4th Cir. 2013) ..................................................... 27

*Vitol, S.A. v. Primrose Shipping Co., Ltd.,*
708 F.3d 527 (4th Cir. 2013) ........................................... *passim*

*In re W.R. Grace & Co.,*
591 F.3d 164 (3d Cir. 2009) ..................................................... 39

**Statutes & Rules**

28 U.S.C.
§ 1292(b) ......................................................................................... 3
§ 1332 .............................................................................................. 39
§ 1333 ..................................................................................... 3, 4, 7, 13
§ 1334(b) ........................................................................................ 39

Fed. R. App. P.
    4(a) ................................................................................ 3
    5(a)(2) ............................................................................. 3

Fed. R. Civ. P.
    9(h) .............................................................................. 14
    Admiralty Rule A(1)(i) ................................................ 14
    Admiralty Rule B ................................................. *passim*

## Other Authorities

1 Benedict on Admiralty (2010) ............................................ 19, 28

Timothy E. Lynch, *Derivatives: A Twenty-First Century Understanding*, 43 Loyola U. Chi. L.J. 1 ................................... 4, 5, 6, 29

Restatement (Third) Foreign Relations  (1987) ........................................ 21

# INTRODUCTION

This case presents a question of admiralty jurisdiction. The plaintiff in this action was a party to contracts known as Forward Freight Agreements (FFAs)—essentially, derivatives in which the parties agree to make payments to one another based upon changes in aggregate shipping rates. Plaintiff prevailed in a suit brought in English court against a third party to enforce these contracts; it is settled that the action producing that judgment was *not* regarded as maritime in nature under English law. Plaintiff then registered its English judgment in federal court in New York and, ultimately, in the Eastern District of Virginia. When a ship owned by the defendant in this action docked in Norfolk, plaintiff invoked the federal court's admiralty jurisdiction and attached the vessel, asserting that defendant is the alter ego of the entity against which plaintiff obtained its English judgment.

All agree that the district court has jurisdiction to entertain the attachment action only if the case falls within its maritime jurisdiction; the question here is whether it does. The district court held that jurisdiction does lie, regarding it as immaterial that the underlying judgment was not considered maritime by the English court that issued it. But that conclusion was incorrect, for two reasons.

1

*First*, when a case involves the enforcement of a foreign judgment, a U.S. court looks to the law of the court that issued the judgment to determine whether the action and judgment should be regarded as maritime in nature. That was the law in this country even prior to the Constitution's creation of maritime jurisdiction, has been the settled rule for more than two centuries, and recently was stated and applied in unambiguous terms by this Court. This rule follows both from fundamental principles of comity and from the policies that underlie maritime jurisdiction; in a case like this one, where the United States has *no* interest in either the judgment or the underlying dispute, it makes no sense for a U.S. court to disregard the law of the nation that issued the judgment to be enforced in characterizing the nature of that judgment. Because the judgment at issue here unquestionably is not maritime under English law, this attachment action should be dismissed.

*Second*, even if the court looks to U.S. law to determine whether the FFAs that gave rise to this suit are maritime in nature, maritime jurisdiction cannot be established here. Contracts are maritime only when they have a substantial connection to the operation of a ship, its navigation, or its management afloat. FFAs generally lack that quality: they are derivatives that do not dictate the terms of any particular

2

nautical transportation of goods and, indeed, have no direct connection to any particular vessel. And to the extent that it could be reasonable to regard FFAs as maritime in some circumstances, a court would have to engage in a particularized inquiry to determine that a given use of FFAs really did have the protection of maritime commerce as a principal objective—and was not, for example, a simple exercise in financial speculation, as is true of much derivative trading. Because the district court did not apply the governing standard and did not engage in this inquiry, the decision below should be reversed for this reason as well.

## STATEMENT OF JURISDICTION

The district court asserted admiralty jurisdiction over this attachment matter under 28 U.S.C. § 1333; for the reasons addressed below, the district court in fact lacked admiralty jurisdiction. This Court has jurisdiction to review the district court's order under 28 U.S.C. § 1292(b). JA 423-29.

This appeal is timely. *See* Fed. R. App. P. 4(a) & 5(a)(2). On January 10, 2014, the district court certified the order under review for interlocutory appeal. JA 423. Defendant-appellant filed its petition for permission to appeal with this Court on January 16, 2014. *See* 14-mc-111. This Court granted the petition on March 4, 2014. JA 430.

3

## STATEMENT OF THE ISSUES

The questions presented for resolution by this Court are as follows:

(1)     Whether the District Court lacked admiralty jurisdiction under 28 U.S.C. § 1333 to consider this action to enforce an English judgment because the judgment was issued by court that was not sitting in admiralty and is not maritime in character under English law.

(2)     Whether the District Court lacked admiralty jurisdiction because the English judgment concerns contracts that are not maritime in nature under U.S. law.

## STATEMENT OF FACTS

1. In 2008, Plaintiff S.A. Flame (Flame) and a third party, Industrial Carriers, Inc. (ICI) (who did not appear in the proceedings below and is not a party to this appeal), entered into four FFAs. JA 408, ¶ 24. FFAs are a form of derivative; they are "bilateral agreements, frequently between a commercial entity involved with" shipping "and a financial intermediary, whereby cash payments are exchanged periodically (or a lump sum at termination) between the parties based upon changes in" shipping rates. *In re Interbulk, Ltd.*, 240 B.R. 195, 201 (Bankr. S.D.N.Y. 1999); *see also, e.g.*, Timothy E. Lynch, *Derivatives: A Twenty-First Century Understanding*, 43 Loyola U. Chi. L.J. 1, 24 n.86 (describing FFAs as

4

"[f]reight derivatives ... in which the net payoffs of the [parties] are a function of future shipping rates and/or freight shipping costs indexes"). FFAs contain a fixed rate (contract price), quantity (days), and period (months, quarter, or calendar year) based on a specific route or average of routes of a designated shipping index in the future. JA 200-201. They do not relate to any particular vessel, cargo, crew, or voyage; do not involve any charter party; do not involve any physical performance; and do not contemplate any maritime obligations. JA 202, ¶ 8.

FFAs are bought and sold to be settled against the specified index on a date certain (*i.e.* the end of each month), published by the Baltic Exchange on a daily basis. JA 202, ¶ 3. The cash settlement is calculated as the difference between the settlement price (published by the Baltic exchange)[1] and the contract rate agreed times the number of days selected by the parties. JA 202, ¶ 6. The specific FFAs in this case are four contracts between Flame and ICI during the calendar year of 2009 for the

---

[1]   The "Baltic index" against which these FFAs were settled are not based on a specific ship or a specific cargo; rather, the index is calculated by the Baltic Exchange collecting data from a panel of brokers about their daily assessment of the value for a "theoretical" Baltic ship on a particular route set by the Baltic Exchange. JA 183-184, ¶¶ 10-12. The settlement rate therefore is based on brokers' best estimate of "fair value" of a theoretical ship carrying a theoretical amount of a certain type of cargo over a particular theoretical route. *Id*.

*average* of "Panamax 4 Time Charter routes," for a quantity of 365 days, calling for cash settlement at the end of each contractual month. JA 242, ¶¶ 1-5. The FFAs called for settlement by cash, without any subsequent physical obligation. *Id.*, *see also* JA 231.

In November 2010, Flame commenced an action against ICI before the High Court of Justice, Queen's Bench Division, Commercial Court Registry in London, England (the "London High Court"), alleging that ICI had breached the FFAs and seeking approximately USD 20 million in damages. JA 409, ¶ 32. The London High Court entered judgment, by default, in favor of Flame on December 13, 2010. JA 409, ¶ 33. On October 4, 2011, the U.S. District Court for the Southern District of New York entered judgment against ICI—again, by default—confirming and recognizing the judgment entered by the London High Court. Flame registered the New York judgment in the United States District Court for the Eastern District of Virginia on October 17, 2013. JA 411, ¶ 41 and Exhibit "E" (JA 59-65).

2. On November 22, 2013, Flame sought an *ex parte* Order of Attachment over the vessel M/V CAPE VIEWER, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Supplemental Rules"), to enforce the English judgment against ICI. JA

6

17-106. The CAPE VIEWER, which was then docked at Norfolk, Virginia, is owned by Defendant Freight Bulk Pte. Ltd. (FBP), an entity that was formed more than four years after the alleged contracts at issue between Flame and its counter-party ICI were agreed-to and subsequently breached. Flame nevertheless sought to attach the M/V CAPE VIEWER based on the allegation that FBP is ICI's alter ego. The sole basis of subject matter jurisdiction asserted by Flame was that the case is one of "admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333." JA 18, ¶ 9; JA 405, ¶ 9. The United States Marshal served the Order of Attachment on or about November 28, 2013. Since then, the vessel has sat idle at anchorage in the Eastern District of Virginia.

One business day after the M/V CAPE VIEWER was attached, FBP filed a motion to vacate the Order of Attachment on the grounds that the District Court did not have subject matter jurisdiction and that Flame's Verified Complaint failed to set forth a reasonable basis to pierce FBP's corporate veil. JA 107. The district court held hearings on FBP's motion to vacate on December 6, 2013 (*see* JA 131-178), December 13, 2013 (*see* JA 271-295), and January 7, 2014 (*see* JA 296-356).

On January 10, 2014, the district court denied FBP's motion to vacate as to the question of the Court's subject matter jurisdiction. JA 423-429.[2]

The court recognized that the controlling question is whether the English judgment should be regarded as maritime in character; if it is not, the court lacks admiralty jurisdiction. Accordingly, in determining that it has jurisdiction over the case, the district court observed that "applying federal law as opposed to English law [in determining the character of the English judgment] makes all the difference" (JA 425) because, "[i]f English law is applied, there is no admiralty jurisdiction." JA 423.

Against that background, the court observed that "[g]enerally procedural questions in federal court are governed by federal law," but found that "it is not clear whether the Fourth Circuit follows such a rule when determining whether or not a foreign judgment should be enforced via admiralty jurisdiction." JA 425. The court further noted that, in *Vitol, S.A. v. Primrose Shipping Co., Ltd.*, 708 F.3d 527 (4th Cir. 2013), this Court "seemed to presume that English law governed" and "appeared to look to English law" in determining the character of the claim. JA 425-426.

---

[2]  The Court reserved decision on all other threshold issues, including whether Flame had asserted a reasonable basis for piercing FBP's corporate veil. *See* JA 423-429.

8

But the district court chose instead to follow the approach taken by the Second Circuit in *Blue Whale Corp. v. Grand China Shipping Dev. Co., Ltd.*, 722 F.3d 488 (2d Cir. 2013), which found that the question of jurisdiction is resolved by application of federal admiralty law. JA 426.

Applying that standard, the court recognized that "[i]t is apparent … that under English law the FFA's would not be maritime contracts and as a result the English judgment in this matter would not be an admiralty judgment." JA 427. But the court believed that under federal law "it appears that the FFA's in question would certainly be maritime contracts" because, "[w]hile it is true that the FFA's are a form of derivative contracts and therefore not purely maritime, they are singularly concerned with shipping routes." *Id.* The court added that to "apply English law would result in a precedent whereby determination of admiralty jurisdiction would be subject to the variances and uncertainties of foreign law," which the court thought "would be in direct contradiction with [*Norfolk Southern Railway Co. v. Kirby*'s] clear preference for uniformity in admiralty cases." JA 428.

Having reached that conclusion, however, the district court recognized the "complexities and uncertainties involved in this case and the importance of clarifying the procedural issues presented," and certified

9

the matter for expedited interlocutory review by this Court. JA 429. FBP timely filed its petition for permission to appeal on January 16, 2014. This Court granted FBP's petition on March 4, 2014. JA 430.

## SUMMARY OF ARGUMENT

All agree that the district court had jurisdiction in this case only if the English judgment that Flame seeks to enforce is regarded as maritime in nature. Under the governing standard, the judgment lacks that quality. It unquestionably is not considered maritime under English law, and that determination is controlling here. And even if that were not so, the contracts that gave rise to the English judgment are not maritime under U.S. law. The district court therefore lacked jurisdiction to issue the attachment and entertain this case.

I.   When an action is brought in U.S. admiralty court to enforce a foreign judgment, the character of the judgment (as one in admiralty, or not) under the law of the nation that issued the judgment determines whether the action is regarded as maritime for purposes of U.S. law. That is the plain implication of this Court's decision in *Vitol*, which found it dispositive that the English judgment at issue in that case was an admiralty claim "as that term is understood by the courts of England." 708 F.3d at 535. It was necessarily implicit in this Court's analysis that the

10

character accorded the foreign judgment by the issuing court controls; this Court in *Vitol* undertook no analysis at all of U.S. maritime law.

That rule follows from the long and consistently held understanding of U.S. courts, dating back more than two centuries, that a U.S. court sitting in admiralty has jurisdiction to enforce the judgments of foreign "admiralty courts." It would have made no sense for the rule to be couched in those terms—that is, that a U.S. court sitting in admiralty will enforce the judgment of a "foreign admiralty court"—if U.S. courts look simply to whether the foreign action would be regarded as maritime under U.S. standards. If that were the rule, the status of the foreign tribunal issuing the judgment to be enforced would be immaterial—and not, as it actually is, dispositive.

The contrary arguments advanced by Flame and accepted by the district court lack merit. The court relied principally on the Second Circuit's decision in *Blue Whale Corp. v. Grand China Shipping Development Co.*, 722 F.3d 488 (2d Cir. 2013), but that ruling must be disregarded to the extent it conflicts with *Vitol* and, in any event, did not involve an action to enforce a foreign judgment—a crucial distinction, given the powerful comity interests at stake where foreign judgments are at issue. The district court also relied on the doctrine that federal law

11

controls procedural determinations like those governing jurisdiction, but that observation simply begs the question whether the federal rule of decision *itself* looks to foreign law. And uniformity concerns do not support the ruling below; having the status of judgments governed by the law of the issuing nation will not and could not subject entities to inconsistent requirements.

II. Jurisdiction should not be found even if U.S. law governs the inquiry whether the English judgment (and the underlying FFA contracts) are maritime. Whether a contract is maritime depends on its nature and, in particular, on whether the contract has a direct and substantial link to the operation of a ship, its navigation, or its management afloat. The FFAs at issue here do not satisfy that test.

As a general matter, FFAs are "swaps" in which money changes hands based upon aggregate changes in shipping rates. They involve no particular ship, maritime service, cargo to be shipped, or freight to be paid. As a consequence, they cannot be said to have either the transportation of specific goods or maritime commerce more generally as their primary objective—and FFAs therefore are categorically *not* maritime in the controlling sense. Moreover, even if an FFA could qualify as maritime under certain circumstances, the contracts at issue in this case do not:

there is reason to believe that Flame used the FFAs not as hedges in aid of a shipping business, but as bald financial speculation—which is the character of many investments in derivatives. Accordingly, if the Court concludes that FFAs may in some circumstances be maritime contracts (and if it also holds that English law does not govern the inquiry), it should remand the case so that the district court may conduct a detailed factual inquiry under the proper standard regarding the nature of the English judgment.

## STANDARD OF REVIEW

This appeal challenges the District Court's exercise of admiralty jurisdiction under 28 U.S.C. § 1333. "An issue of the district court's subject matter jurisdiction is a question of law that the Court reviews *de novo.*" *Vitol,* 708 F.3d at 533 (citing *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 515 F.3d 344, 347 n. 1 (4th Cir. 2008)); *see also United Transp. Union v. S.C. Pub. Ry. Comm'n,* 130 F.3d 627, 631 (4th Cir. 1997) ("[W]e review the exercise of subject matter jurisdiction *de novo.*") (citing *Ahmed v. United States*, 30 F.3d 514, 516 (4th Cir. 1994)).

## ARGUMENT

The only question now before this Court is whether plaintiff Flame's enforcement action is maritime in nature: it is axiomatic, and undisputed,

13

that a maritime Rule B attachment is available only if the plaintiff has a maritime claim against the party whose property it seeks to attach. *See Vitol*, 708 F.3d at 541 (noting plaintiff's burden to show that, *inter alia*, "it has a valid prima facie admiralty claim against the defendant"); Supplemental Rule A(1)(i) (providing that the Supplemental Rules apply to "the procedure in admiralty and maritime claims within the meaning of Rule 9(h) with respect to ... maritime attachment and garnishment"). Thus, as this Court has recognized, "the dispositive question is ... whether the claim itself is maritime in nature." *Vitol*, 708 F.3d 534 (citing *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987)).

The claims here, however, are *not* maritime in nature, for two related reasons. The foreign judgment that Flame now seeks to enforce was not regarded as maritime by the issuing court, and that determination is controlling for present purposes. And if this court itself conducts its own analysis under U.S. maritime law, it should conclude that FFAs—which are derivative contracts that do not govern the terms of any particular maritime shipment or voyage—are not, and certainly are not necessarily and in all cases, maritime contracts.

Those conclusions resolve this appeal. Plaintiffs generally bear the burden of establishing subject matter jurisdiction (*see, e.g., Miller v.*

14

*Brown*, 462 F.3d 312, 316 (4th Cir. 2006); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)); in this context in particular, "[t]o avoid the vacatur of an attachment … it is the plaintiff's burden to show that '… it has a valid prima facie admiralty claim against the defendant.'" *Vitol*, 708 F.3d at 541 (quoting *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006)). Because Flame's underlying claim and subsequent foreign money judgment against ICI are not maritime, it cannot make the necessary showing here. The district court accordingly should have dismissed the attachment action for lack of jurisdiction.[3]

## I.  A U.S. Court Lacks Admiralty Jurisdiction To Enforce A Non-Maritime Judgment Of A Foreign Court.

At the outset, there is no serious dispute, as the district court itself recognized, "that under English law the FFA's would not be maritime contracts and as a result the English judgment in this matter would not be

---

[3]  FBP also contends that Flame is unable to make a prima facie showing that its claim is valid because its complaint does not state a valid basis to pierce FBP's corporate veil; the district court reserved judgment on that question, which is not now before this Court. The other requirements to avoid vacatur of an attachment—that the defendant cannot be found within the district, that defendant's property may be found within the district, and that there is no statutory or maritime law bar to the attachment (*see Vitol*, 708 F.3d at 541)—are not in dispute.

15

an admiralty judgment." JA 427 [slip op. 5].[4] And that is enough to resolve this appeal: when an action is brought in U.S. court to enforce a foreign judgment, the character of that judgment (as one in admiralty, or not) *under the law of the nation that issued it* determines whether the action is regarded as maritime for purposes of U.S. law. That conclusion follows from compelling considerations of comity, history, and maritime policy.[5]

1. To begin with, that is the plain implication of this Court's recent decision in *Vitol*. As in this case, the question in *Vitol* concerned whether the district court erroneously asserted subject matter jurisdiction in an action to recognize and enforce what was contended to be a non-maritime English judgment. 708 F.3d at 533-34. This Court found it "well recognized that federal courts in the United States possess jurisdiction in admiralty over claims to enforce *a foreign admiralty judgment*." *Id*. at 533 (emphasis added). And after examining English law, the Court rejected the argument

---

[4]   That conclusion about the character of English law was supported by unrebutted expert declarations and undoubtedly is correct. *See* JA 110-111, 120-123.

[5]   Indeed, Flame itself initially acknowledged that point below. In its Memorandum in Support of the Attachment, Flame acknowledged that "the question of whether a party has asserted a valid admiralty claim within the ambit of Rule B must be decided under the law of the maritime contract relied upon by the parties, which in this case is English law." JA 92-93.

16

that the underlying claim in *Vitol* was *per se* non-maritime because the judgment had been issued by the London High Court's Commercial Court rather than the Admiralty Court. Because the case "could have been brought in *either* the Commercial Court or the Admiralty Court," this Court found it dispositive that the action "was an admiralty claim *as that term is understood by the courts of England*." *Id.* at 534-35 (second emphasis added).

It is necessarily implicit in that analysis that the character accorded the underlying foreign judgment by the issuing court controls in determining whether that judgment is maritime for purposes of establishing U.S. maritime jurisdiction. Thus, the *Vitol* Court undertook *no* analysis of U.S. law and, indeed, made *no* mention of the question whether the underlying judgment in that case would be regarded as maritime in nature under U.S. law. Moreover, the Court declined to do so even though U.S. and English maritime law differ in significant respects. *See*, *e.g.*, *D'Amico Dry Ltd. v. Primera Maritime (Hellas) Ltd.*, 2011 WL 1239861, at *3 & n.2 (S.D.N.Y. 2011). Instead, the Court treated the characterization of the claim "by the courts of England" as the controlling characterization. *Vitol*, 708 F.3d at 535. That could not have been so had the governing rule been the one applied by the district court in this case,

17

which looked to how the foreign action would have been characterized had it been brought in the United States.

That the Court reached this conclusion in *Vitol* is not surprising: it follows from the understanding, "long and consistently held" by U.S. courts, that "admiralty jurisdiction [is] well-founded to enforce judgments of foreign admiralty courts." *Vitol*, 708 F.3d at 534 (citing authority). This deference to the law of the nation issuing the judgment rests on "a 'general principle,' grounded in concerns of comity, empowering admiralty courts to enforce the decrees of foreign admiralty courts," which "was already 'settled law and usage' by 1795." *D'Amico Dry Ltd.* 2011 WL 1239861, at *2 (citing authority). Indeed, this is, as the Supreme Court described another admiralty doctrine, an "established rule of ancient respectability" (*Kossick v. United Fruit Co.*, 365 U.S. at 734) that predates the Constitution's establishment of maritime jurisdiction and has been recognized by the Supreme Court since the eighteenth century, when the Court "spoke in broad terms of the jurisdiction of admiralty courts to enforce the decrees of foreign maritime courts." *Int'l Sea Food Ltd. v. Campeche*, 566 F.2d 482, 484 (5th Cir. 1978) (citing cases).[6]

---

[6] That rule of comity is so firm that a U.S. admiralty court has jurisdiction to enforce the judgment of a foreign court sitting in admiralty

18

It would have made no sense for the rule to be couched in these terms—that is, that U.S. courts sitting in admiralty will "'enforce a judgment of a *foreign admiralty court*'" (*Vitol*, 708 F.3d at 534 (quoting 1 Benedict on Admiralty § 106)), or of "*another admiralty court*" (*The Centurion*, 5 F. Cas. 369, 370 (D. Me. 1839) (emphasis added)), or of "the *Court of Admiralty of another [nation]*" (*Penhallow v. Doane's Adm'rs*, 3 U.S. (3 Dall.) 54, 97 (1795) (Iredell, J.) (emphasis added))—if U.S. courts simply looked to whether the foreign action (or judgment) would be regarded as maritime under U.S. standards. If that were the rule, the status of the foreign tribunal issuing the judgment as a "court of admiralty" under that nation's laws, or the treatment of the claim as one in admiralty under foreign law, would be wholly immaterial. But instead, that status has been regarded as *controlling* for purposes if U.S. admiralty jurisdiction since the foundation of the Republic.

The proper approach accordingly is illustrated by the analysis of the Southern District of New York in *D'Amico Dry Limited*, a case involving a

---

even if that judgment lacks "maritime flavor" as a matter of U.S. law. *Campeche*, 566 F.2d at 485. In this context, the decision in *Vitol* actually extends the respect given foreign law by holding that a U.S. admiralty court will respect, not only judgments issued by foreign courts expressly sitting as courts of admiralty, but also the foreign nation's more general characterization of its law as maritime in nature. *See* 708 F.3d at 534-535.

19

dispute about FFAs that was essentially identical to this one. Judge Koeltl there noted that "federal courts have admiralty jurisdiction to enforce judgments of foreign admiralty courts." 2011 WL 1239861, at *3. He recognized that "[t]he question, then, is whether the English judgment was rendered in an exercise of the admiralty jurisdiction of the English court—that is, whether the claim adjudicated was, under English law, maritime in nature." *Id*. And "[b]ecause the English court was not sitting as an admiralty court when it rendered the English [j]udgment, this Court does not have jurisdiction over an action to enforce that judgment." *Id*. at *4; *accord Pioneer Freight Futures Company Limited v. Marine Trade S.A.*, 2011 U.S. Dist. LEXIS 157971 (C.D. Cal. 2011).[7]

2. In response to this weight of authority, the arguments advanced by Flame and accepted by the district court are unavailing.

*First*, in the district court, Flame argued that the Second Circuit's decision in *Blue Whale Corp. v. Grand China Shipping Development Co.*, 722 F.3d 488 (2d Cir. 2013), supported its view that Rule B attachments may be used to enforce the non-admiralty judgments of foreign courts. But

---

[7]    The plaintiff in *D'Amico* appealed Judge Koeltl's decision on August 25, 2011. The matter has been briefed and oral argument was heard by the Second Circuit on September 21, 2012. The matter remains *sub judice* before the Second Circuit.

20

Flame cannot properly rely on *Blue Whale*. For one thing, that decision must be disregarded to the extent that it conflicts with this Court's analysis in *Vitol*, which makes clear that the "maritime ... nature" of a foreign judgment under foreign law is "dispositive" in determining whether a Rule B attachment may be used to enforce the judgment. 708 F.3d at 535.

Furthermore, *Blue Whale* differs from this case in crucial respects. The plaintiff in *Blue Whale* "s[ought] to attach property ... in anticipation of a future arbitration award" in England, not to enforce a judgment *already* rendered. 722 F.3d at 491. The Second Circuit therefore had no occasion to determine whether Rule B could be used to enforce a foreign non-admiralty judgment. Yet the nature of this case as a proceeding to enforce a judgment changes the character of the inquiry significantly. An action to enforce a foreign judgment is a separate civil action "imposing its own jurisdictional requirements." *D'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd.*, 2011 WL 3273208, at *4 (S.D.N.Y. 2011) (citing *Bergen Indus. & Fishing Corp. v. Joint Stock Holding Co.*, 2002 WL 1587179, at *1 (W.D. Wa. 2002) (citing Restatement (Third) Foreign Relations § 481 cmt. g, h. (1987)). And comity concerns are at their height where a foreign

21

judgment has been issued. *See Hilton v. Guyot*, 159 U.S. 113, 163-67 (1895).

*Second*, the district court in this case, like the Second Circuit in *Blue Whale*, placed principal reliance on the observation that the question of jurisdiction is procedural and "federal law controls [a] procedural inquiry." *Blue Whale*, 722 F.3d at 494. But the Second Circuit offered absolutely no rationale for or analysis in support of its conclusion that this proposition requires disregarding the foreign court's view of the nature of its judgment. In fact, the Second Circuit devoted only a single paragraph to its determination that the case sounded in admiralty (*id*.)—which is unsurprising, given that the parties in *Blue Whale* did not dispute either that issue or that the underlying action in the case *was* maritime in nature. The Second Circuit devoted most of its attention to a different question—whether the enquiry into the prima facie validity of the attachment is governed by the relevant substantive law and choice-of-law analysis regarding that very different issue (*see id*. at 494-500).

On examination, we respectfully submit that the *Blue Whale* court simply assumed the wrong conclusion on this point. It may well be that federal law states the rule for determining the existence of federal jurisdiction, but here the *federal rule of decision*—as stated by federal

22

courts for more than two centuries—*itself* looks to the foreign court's characterization of the judgment to be enforced in admiralty. There is nothing extraordinary in having jurisdiction turn on one sovereign's incorporation of the law of another, where the foreign sovereign's interest predominates; to offer just one example, although the Supreme Court ordinarily lacks jurisdiction to review state-court judgments on matters of state law, a federal question supporting Supreme Court jurisdiction may exist when state law incorporates a principle of federal law. *See*, *e.g.*, *Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 106 (2003); *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983).

Here, long experience shows that the interest in the integrity of another sovereign's judgments and judicial processes is entitled to deference as a matter of comity and judicial practice—particularly in a case, such as this one, where the United States has no interest *at all* in either the parties to the dispute or the underlying foreign judgment, other than the fortuity of a foreign vessel having briefly docked in a U.S. port. That tenuous connection provides no basis for United States law to dictate whether the contract is maritime in nature. *Cf. Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 60-61 (2d Cir. 2009) (overruling prior case law allowing the "momentary passage" of "electronic

fund transfers ... through New York" to confer admiralty jurisdiction and allow Rule B attachment proceedings to begin). In these circumstances, there can be little doubt that recharacterizing a foreign non-admiralty judgment as maritime in nature simply because the underlying dispute would have fallen within the relatively "expansive view" of admiralty jurisdiction in the United States would pose "risks to international comity." *Daimler AG v. Bauman*, 134 S. Ct. 746, 763 (2014).[8]

*Third*, the district court, relying on *Kirby*, suggested that disregarding the foreign court's view of its own judgment would further interests in uniformity. *See* JA 426-27. But this analysis, in our view, did not take proper account of the role that the need for uniformity plays in admiralty law. To be sure, "[t]he fundamental interest giving rise to maritime jurisdiction is 'the protection of maritime commerce,' ... and [the

---

[8]  In addition, any extension of admiralty jurisdiction to the enforcement of judgments that do not constitute admiralty judgments in the issuing jurisdiction would encourage forum-shopping. A party seeking to attach a vessel would have a strong incentive to pursue an initial judgment from a civil tribunal that provided defendants with relatively few procedural protections—and then to seek enforcement of that judgment in a Rule B proceeding in the United States. Flame chose to initiate its action in England, where its suit was not regarded as maritime; having made that choice, it should not be permitted to game the system by invoking maritime attachment procedures in the United States. *Cf. Kossick*, 365 U.S. at 741 ("It must be remembered that we are dealing here with a contract, and therefore with obligations, by hypothesis, voluntarily undertaken.").

Supreme Court has] said that that interest cannot be fully vindicated unless '*all* operators of vessels on navigable waters are subject to uniform rules of conduct.'" *Sisson v. Ruby*, 497 U.S. 358, 366 (1990); s*ee also Norfolk S. Ry. v. Kirby*, 543 U.S. 14, 29 (2004) ("confusion and inefficiency will inevitably result if more than one body of law governs a contract's meaning"). But unlike the situation in those cases, the rule at issue here governs neither primary conduct nor the substantive meaning of contracts. The question instead is whether individual judgments should be characterized as maritime (or not) by the law of the nation where they were issued; applying that law in a dispute such as this one cannot subject entities to inconsistent requirements or obligations. If anything, it is Flame's rule that leads to disuniformity, as—just as in this case—it allows the *same* judgment to be characterized differently in different jurisdictions, and therefore may be subjected to different substantive rules by courts in different nations.

## II. The Contracts At Issue Are Not Maritime As A Matter of U.S. Federal Law.

The recognition that English law controls here thus is enough to dispose of this appeal. But reversal would be appropriate even if U.S. law governed the question whether the judgment Flame seeks to enforce was

maritime in nature. Because the English judgment involves breach of contract, the district court had admiralty jurisdiction over the action only if the contracts in issue were themselves maritime—which is to say, if the contracts had the objective of advancing maritime commerce. FFAs do not meet that test: Because FFAs are derivatives that amount to bets on the future direction of shipping prices, they lack any connection to particular vessels or shipments and have an insufficient impact on maritime commerce to qualify as maritime in nature.

Furthermore, even assuming that FFAs could in some circumstances be seen having a maritime character, the record suggests that the FFAs at issue in this case were purely financial transactions. At a minimum, then, the case should be remanded to the district court so that it may determine under the proper standard whether the specific FFAs giving rise to the English judgment constitute maritime contracts.

## A. Admiralty Jurisdiction Extends Only To Contracts That Have The Objective Of Maritime Commerce.

Federal admiralty jurisdiction covers contractual disputes only if the contract at issue "is a maritime one." *Kirby*, 543 U.S. at 22-23. Whether a contract is maritime "'depends upon ... the nature and character of the contract.'" *Id.* at 24 (quoting *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. &*

*Shipbuilding Co.*, 249 U.S. 119, 125 (1919)). Specifically, because "the 'fundamental interest giving rise to maritime jurisdiction is the protection of maritime *commerce*,'" a contract is maritime if, and only if, the "principal objective of [the] contract is maritime commerce." *Id.* at 25 (quoting *Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 608 (1991)) (emphasis in *Kirby*); *accord, e.g.*, *Village of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 196 (4th Cir. 2013); *Barna Conshipping, S.L. v. 2,000 Metric Tons, More or Less, of Abandoned Steel*, 410 Fed. Appx. 716, 722 (4th Cir. 2011). "[T]he true criterion" in assessing whether a contract is maritime is thus "whether it has 'reference to maritime service or maritime transactions.'" *Kirby*, 543 U.S. at 24 (quoting *N. Pac. S.S. Co.*, 249 U.S. at 125).

"Not every contract that somehow relates to a ship or its business is considered maritime." *Nehring v. S.S. M/V Point Vail*, 901 F.2d 1044, 1048 (11th Cir. 1990); *see also, e.g.*, *Thames Towboat Co. v. Francis McDonald*, 254 U.S. 242 (1920) (ruling that a dispute arising from a shipbuilding contract does not fall within U.S. admiralty jurisdiction). Rather, because maritime contracts must have the furtherance of maritime commerce as their "*principal* objective" (*Kirby*, 543 U.S. at 24 (emphasis added)), a contract is maritime only if there is "'a direct and

27

substantial link between the contract and the operation of the ship, its navigation, or its management afloat'" (*Alphamate Commodity GMBH v. CHS Europe SA*, 627 F.3d 183, 187 (5th Cir. 2010) (quoting 1 Benedict on Admiralty § 182 (2010)) (emphases omitted)). "Contracts that are 'mixed'— that contain maritime and non-maritime elements—generally fall outside of admiralty jurisdiction," unless "the claim arises from a breach of a maritime obligation that is severable from the non-maritime obligations of the contract" or "the non-maritime elements are merely incidental." *EFKO Food Ingredients Ltd. v. Pac. Inter-Link SDN BHD*, 582 F. Supp. 2d 466, 470 (S.D.N.Y. 2008) (quoting *Folksam. Reins. Co. v. Clean Water of N.Y., Inc.*, 413 F.3d 307, 314 (2d Cir. 2005)). Accordingly, as a leading treatise observes, "[a]dmiralty does not recognize contracts that … are not actually concerned with the business of running or navigating a boat." 1 Benedict on Admiralty § 183 (7th ed. 2010).

### B. FFAs Are Not Maritime Contracts.

FFAs do not satisfy this test. They are derivatives that parties use to bet on the future direction of prices associated with particular shipping routes. They lack any significant connection to either the transport of particular cargo or the actual conduct of maritime commerce. FFAs therefore cannot be seen as maritime contracts. Numerous prior decisions

28

involving both FFAs and other contracts that had only a limited connection to maritime commerce confirm that result, and the district court provided no persuasive basis for its contrary conclusion.

> **1.  FFAs have no connection to specific voyages or cargo and do not have the primary objective of furthering maritime commerce.**

FFAs do not have maritime commerce as their principal objective. They are "swaps," which is to say that they are "bilateral agreement[s], frequently between a commercial entity involved with" shipping "and a financial intermediary, whereby cash payments are exchanged periodically (or a lump sum at termination) between the parties based upon changes in" shipping rates. *In re Interbulk, Ltd.*, 240 B.R. 195, 201 (Bankr. S.D.N.Y. 1999); *see also, e.g.*, Timothy E. Lynch, *Derivatives: A Twenty-First Century Understanding*, 43 Loyola U. Chi. L.J. 1, 24 n.86 (describing FFAs as "[f]reight derivatives ... in which the net payoffs of the [parties] are a function of future shipping rates and/or freight shipping costs indexes"). Specifically, FFAs are "futures contracts based upon the cost of freight associated with maritime trade routes." *Farenco Shipping Co. v. Farenco Shipping Pte Ltd.*, 2012 WL 5614999, at *2 (E.D. La. 2012). Parties to FFAs need not be involved in maritime shipping at all; entities that are engaged in maritime commerce may use use FFAs "to

29

hedge against" changes in "charter rates" that might detrimentally impact the company's bottom line. *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 2010 WL 446529, at *2 n.4 (S.D.N.Y. 2010) (discussing a report to the SEC). In either event, FFAs are financial instruments that do not involve "an actual commitment to move cargo." *Farenco*, 2012 WL 5614999, at *2.

FBP presented unrebutted declarations to the district court that delineated these characteristics of FFAs in detail. Massimiliano Zacchello, an FFA trader who is "classified as a 'Professional' individual investor under" the Markets in Financial Instruments Directive of the European Union, described FFAs as "financial contract[s] in which buyer and seller agree to exchange a certain amount of money in the future, the amount to be calculated against the settlement of the relevant [market] index over a certain period of time." JA 182-183. Karina Albers, a London-based FFA broker, trader, and consultant, similarly defined FFAs as "financial instruments traded over-the-counter and not on an exchange" that are used to "speculate, arbitrate, to hedge and to re-distribute market risk." JA 200. And Zacchello stated unequivocally that, because FFAs have these features, "[o]ne cannot lift a cargo using a[n] FFA contract." JA 184. To the contrary, "a standard FFA is related to freight only as a monetary value and not to the freight itself as a logistic service." *Id.*

30

The FFAs at issue here conform to these standard features. The contracts involved no particular ship, maritime service, cargo to be shipped, or freight to be paid. *See, e.g.*, JA 204-205, 240-270. Instead, as Allesandro Ballerini, one of Flame's directors, acknowledged during his deposition, each FFA contemplated a cash settlement based on index rates for particular routes. *See* JA 225-226, 0229; *see also* JA 240-0270. When Flame actually transports cargo in maritime commerce, it follows the industry convention of using charter parties, not FFAs. *See* JA 232.

In short, FFAs—including the FFAs giving rise to the underlying dispute in this case—simply represent future bets on the direction of shipping prices. As a result, they cannot be said to have either the transportation of specific goods or "maritime commerce" more generally as their primary objective. *Kirby*, 543 U.S. at 24. There can be no "direct and substantial link" between an FFA and any particular ship or cargo, given that FFAs are not contracts for the transportation of goods. In fact, because FFAs are tied to an index for a general "type of voyage" or "period of time" (JA 115), they lack a financial connection of any sort to a particular shipment or vessel. This lack of connection to a "maritime service or maritime transaction[]" sharply distinguishes FFAs from

31

contracts, such as the bill of lading at issue in *Kirby*, that directly govern "the transportation of goods" by sea. *Kirby*, 543 U.S. at 18, 24.

FFAs also have no substantial link to "maritime service or maritime transactions" generally. *Id.* at 24. Although FFAs represent a bet on the future direction of the shipping market, they do not govern or even significantly affect actual maritime commerce. Instead, FFAs simply attempt to predict the market, and the parties to FFAs use them either as pure profit-making vehicles or to hedge against exposures to changes in shipping market rates. The result is that, while changes in the shipping market directly influence the performance and outcome of FFAs, FFAs do not influence maritime commerce. FFAs are therefore not maritime contracts because maritime commerce cannot be said to be their "primary objective." *Id.*

## 2. Prior decisions confirm that FFAs are not maritime in nature.

As might be expected given this background, a wealth of prior authority weighs against treating FFAs as maritime contracts. Three district courts have, in fact, indicated that FFAs are not maritime in nature. The court in *Farenco* stated, albeit in *dicta*, that FFAs are not "maritime contracts" because they "do not directly involve maritime

32

commerce or an actual commitment to move cargo." 2012 WL 5614999, at

*2. And two other courts have held that FFAs are not maritime contracts

as a matter of English law for reasons that would compel the same

conclusion under federal law. Specifically, those courts recognized that

"FFAs are commodity contracts, not maritime contracts," and "[t]here is no

relationship whatsoever between an FFA and an agreement which would

relate to the carriage of goods in a ship or the use or hire of a ship."

*Pioneer Freight Futures Co. v. Marine Trade S.A.*, 2011 U.S. Dist. LEXIS

157971, at *8 (C.D. Cal. Dec. 20, 2011); *accord D'Amico Dry Ltd.*, 2011

AMC 1484 (S.D.N.Y. Mar. 26, 2011) (concluding under English law that an

action for breach of an FFA did not invoke the "admiralty jurisdiction" of

English courts because it "did not concern a claim arising out of an

agreement relating to the carriage of goods in a ship or the use or hire of a

ship").[9]

The conclusion that FFAs are not maritime commerce is further

reinforced by decisions holding that various other types of contracts are

---

[9]  For the same reasons, claims for breaches of FFAs also do not "f[all] within the description of a general maritime claim" under Australian law. *See Transfield ER Futures Limited v. The Ship 'Giovanna Iuliano'* [2012] FCA 548 (JA 386-403), ¶¶ 25, 35. Understanding that FFAs are maritime in nature therefore would place the United States at odds with its major trading partners.

not maritime even though the contracts have some connection to vessels or maritime cargo. For example, although vessels naturally play a central role in maritime commerce, the "prevailing rule" is "that a contract for the sale of a ship is not a maritime contract." *Flota Maritima Browning de Cuba v. Snobl*, 363 F.2d 733, 735 (4th Cir. 1965).[10] It has been settled for a century and a half that contracts for the construction of ships are similarly non-maritime.[11] And contracts for the goods that vessels transport also do not constitute maritime contracts—even where the contract specifies that goods must be transported by sea.[12] Given that neither contracts for the

---

[10] *See also, e.g.*, *Clem Perrin Marine Towing, Inc. v. Panama Canal Co.*, 730 F.2d 186, 188 (5th Cir. 1984); *The Ada*, 250 F. 194, 195-96 (2d Cir. 1918); *Polestar Mar. Ltd. v. Nanjing Ocean Shipping Co.*, 631 F. Supp. 2d 304, 305 (S.D.N.Y. 2009) (citing *CTI-Container Leasing Corp. v. Oceanic Operations Corp.*, 682 F.2d 377, 380 n.4 (2d Cir. 1982)); *Great E. Shipping Co. v. Maritime Tankers & Shipping Co. Int'l Ltd.*, 631 F. Supp. 2d 392, 395 (S.D.N.Y. 2009); *Aggelikos Prostatis Corp. v. Shun Da Shipping Grp. Ltd.*, 646 F. Supp. 2d 330, 332 (S.D.N.Y. 2009).

[11] *See, e.g.*, *People's Ferry Co. v. Beers*, 61 U.S. 393, 402 (1857); *accord, e.g.*, *Thames Towboat Co. v. The Francis McDonald*, 254 U.S. 242, 244 (1920); *Primera Maritime Ltd. v. Jiangsu E. Heavy Indus. Co.*, 355 Fed. App'x 477, 478 (2d Cir. 2009); *Colonna's Shipyard, Inc. v. U.S.A.F. Gen. Hoyt S. Vandenberg*, 584 F. Supp. 2d 862, 866 (E.D. Va. 2008).

[12] *See, e.g.*, *Lucky-Goldstar, Int'l (Am.) Inc. v. Phibro Energy Int'l, Ltd*, 958 F.2d 58, 59 (5th Cir. 1992); *Noble Res. PTE. Ltd. v. Metinvest Holding Ltd.*, 622 F. Supp. 2d 77, 85 (S.D.N.Y. 2009) (collecting cases); *EFKO Food Ingredients Ltd. v. Pac. Inter-Link SDN BHD*, 582 F. Supp. 2d 466, 470-71 (S.D.N.Y. 2008); *Aston Agro-Indus. AG v. Star Grain Ltd.*, 2006 WL 3755156, at \*3 (S.D.N.Y. 2006); *Shanghai Sinom Import & Export v. Exfin*

34

vessels that transport goods in maritime commerce nor those for the goods that they transport are generally seen as maritime in nature, it follows *a fortiori* that FFAs—which lack *any* concrete connection to maritime commerce—also cannot be seen as maritime.[13]

### 3.   The district court's reasons for reaching the contrary conclusion are unpersuasive.

With respect, the district court's reasons for reaching a contrary conclusion do not withstand scrutiny. The court stated, without any supporting analysis, that FFAs are "singularly concerned with shipping routes." JA0427. But that is not so. FFAs are concerned only with the potential future *prices* associated with shipping routes. Under *Kirby*, that distinction is critical: "[M]aritime commerce" is the "principal objective" of

---

*(India) Mineral Ore Co.*, 2006 WL 4029953, 2006 AMC 2950, 2951 (S.D.N.Y. 2006); *French Republic v. Fahey*, 278 F. 947, 949 (D. Md. 1922).

[13] That this is an enforcement action, as opposed to an action on the underlying contract, does not transform Flame's claim into a maritime action. Even when the underlying contract *is* maritime in nature, "an action commenced solely to enforce a settlement agreement resolving a dispute over a [breach of contract] does not sound in admiralty." *Trireme Mar. Co. v. Breakbulk Marine Servs. Ltd.*, 2009 WL 424352, at *2 (S.D.N.Y. 2009) (citing *Kossick*, 365 U.S. at 735); *Consol. Bathurst, Ltd. v. Rederiaktiebolaget Gustaf Erikson*, 645 F. Supp. 884, 886 (S.D. Fla. 1986); *Mulvaney v. Dalzell Towing Co.*, 90 F. Supp. 259, 260 (S.D.N.Y. 1950). There is no reason to craft a different rule for actions to enforce judgments.

35

contracts concerning shipping routes, but it is *not* the principal objective of contracts that represent mere speculation on future market changes.[14]

The three decisions on which the district court relied, again without analysis (*see* JA 428), are similarly unpersuasive. To be sure, those opinions concluded that FFAs are maritime contracts. *See Transfield ER Futures Ltd. v. Deiulemar Shipping S.P.A*, 2012 123286, at *3 (E.D. La. 2012); *Flame S.A. v. M/V Lynx*, Civ. No. 10-278, Dkt. No. 35 (E.D. Tex. Jun. 22, 2010); *Brave Bulk Transp. Ltd. v. Spot on Shipping Ltd.*, 2007 WL 3255823, at *2 (S.D.N.Y. 2007). But each decision reached that conclusion only by characterizing FFAs as "commitments to perform shipping services in the future" (*Transfield*, 2012 WL 123286, at *) in which the parties "buy and sell a specified tonnage freight at an agreed price for an agreed route and time span" (*Brave Bulk*, 2007 WL 3255823, at *2).[15] As seen above (at

---

[14] The district court also expressed the tentative belief that "Flame's use of [FFAs] appears to have been primarily for hedging the risks inherent in their shipping business" (JA 428). As explained below (at 40), that belief does not withstand close scrutiny.

[15] The court in *Brave Bulk* also cited a number of unpublished decisions of New York federal district courts in support of its conclusion that FFAs are maritime contracts. *See* 2011 WL 3255823, at *2. But each of those decisions involved an *ex parte* Rule B proceeding in which no property had been attached and no defendant ever appeared—meaning that the plaintiffs' legal arguments went unchallenged. Those decisions should accordingly be given no weight in this Court's analysis.

36

28-35), that characterization is incorrect. FFAs are *not* contracts under which goods are shipped by sea; rather, FFAs represent financial bets on future prices.

### C. At A Minimum, This Case Should Be Remanded For The District Court To Determine Whether The FFAs In Issue Are Maritime.

Even if FFAs might qualify as maritime under certain circumstances, that would not end the matter. The particular features of, and circumstances surrounding, a given FFA will be crucial in determining whether maritime commerce forms the principal object of the contract. And because there is reason to believe that the FFAs at issue in this case had *no* impact on maritime commerce, this Court should—at a minimum—remand the case to the district court for a determination whether the specific FFAs giving rise to the English judgment qualify as maritime contracts.

There can be little doubt FFAs can be entirely disconnected from maritime commerce. For instance, because there is no requirement that the parties to FFAs be involved in maritime commerce, it is possible that both parties to a given FFA will be a bank or other financial institution that entered into the contract as a naked bet on the future direction of shipping prices. FFAs between such financial institutions would have

37

exceedingly little to do with maritime commerce; like many types of derivatives, they would instead merely constitute a type of high-risk investment.

Even FFAs between companies that participate in maritime commerce will not always have that commerce as their principal objective. Brokers who pay to ship freight face a unidirectional market risk: A broker is worse off if shipping rates increase, but benefits if shipping rates decline. To mitigate that risk, a broker will typically enter into FFAs that would pay the broker money if prices increase so as to hedge against its losses from higher prices for the actual transport of goods. A broker could, however, exclusively or disproportionately enter into FFAs that paid profits when prices *declined*. In that case, the broker's actions would lack any hedging justification. Instead, like a player in the financial sector, the broker would be doing nothing more than placing naked bets on the direction of the market—and the primary objective of the FFAs would be disconnected from the broker's activities in maritime commerce.

As a result, before an FFA is deemed maritime, the court whose jurisdiction has been invoked should analyze the particular contract at issue to determine how close a tie exists between the contract and maritime commerce. Such a contract-specific focus is consistent with

38

*Kirby*, which held that whether a contract is maritime "'depends upon ... the nature and character of the [specific] contract'" at issue and analyzed the particular provisions of the contract before the Court. 543 U.S. at 24 (quoting *N. Pac. S.S. Co.*, 249 U.S. at 125). The Supreme Court's opinion in *Kirby* thus confirms that "[t]he determination of what constitutes a maritime contract is a highly fact-specific inquiry." *Alex v. Wild Well Control, Inc.*, 2009 WL 2599782, at *9 (E.D. La. 2009). And such "[a] case-by-case approach is" particularly appropriate in cases, like this one, that present "novel or unusual situations." *Crimson Yachts v. Betty Lyn II Motor Yacht*, 603 F.3d 864, 875 (11th Cir. 2010) (quotation marks omitted).[16]

---

[16] The jurisdictional nature of the inquiry into whether a contract is maritime does not preclude a fact-specific, case-by-case analysis. It is, for example, well-established that the determination whether a federal court has diversity jurisdiction under 28 U.S.C. § 1332 "may require fact-intensive inquiries." *Univ. of R.I. v. A.W. Chesterton Co.*, 2 F.3d 1200, 1213 (1st Cir. 1993); *see also, e.g.*, *CMH Homes, Inc. v. Goodner*, 729 F.3d 832, 838 (8th Cir. 2013) ("amount in controversy in [a] putative class action" presents "a fact-intensive question"); *Athena Auto., Inc. v. DiGregorio*, 166 F.3d 288, 291 (4th Cir. 1999) ("determinations of a corporation's principal place of business" depend on "the facts of each case"). Jurisdiction under 28 U.S.C. § 1334(b), which vests the district courts with jurisdiction over, *inter alia*, "civil proceedings ... related to [bankruptcy] cases," is likewise "developed on a fact-specific, case-by-case basis." *In re W.R. Grace & Co.*, 591 F.3d 164, 174 n.9 (3d Cir. 2009); *accord, e.g.*, *In re Boston Reg'l Med. Ctr.*, 410 F.3d 100, 107 (1st Cir. 2005).

In this case, the record contains evidence suggesting that Flame treated the FFAs in issue as simple bets and not as hedging instruments. Flame entered into four FFAs with ICI. *See* JA 240-270. Flame is listed as the "seller" on three of those four FFAs (*see* JA 240, 254, 263)—meaning that, in three of the four contracts, Flame would receive payments if market prices decreased (*see, e.g.*, JA 21, ¶ 25). There is, in other words, evidence to suggest that Flame's position can*not* be viewed a hedge against the possibility of increased shipping rates, but instead was a simple bet that Flame could foresee and profit from future declines in market prices. The result is that, even if FFAs used for hedging or other purposes connected to a broker's shipping business could constitute maritime contracts, the FFAs giving rise to the judgment Flame seeks to enforce might nevertheless *lack* the "salty flavor" of true maritime contracts. *Kossick*, 365 U.S. at 742.

Accordingly, if this Court believes that FFAs might be maritime contracts notwithstanding their financial character, it should remand this case to the district court to give that court "the opportunity in the first instance to address" the question whether the specific FFAs in issue are maritime. *U.S. ex rel. Carter v. Halliburton Co.*, 710 F.3d 171, 184 (4th Cir. 2013).

## CONCLUSION

The decision below should be reversed, and the case should be remanded with instructions to dismiss Flame's Amended Verified Complaint for lack of subject matter jurisdiction; alternatively, the district court should be directed to determine, based on the record, whether the particular contracts at issue here were maritime in character.

Respectfully submitted,

s/ Charles A. Rothfeld
Charles A. Rothfeld
Carmine R. Zarlenga
Richard Caldarone
Paul W. Hughes
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3000

*Attorneys for Defendant-Appellant*

March 25, 2014

## CERTIFICATE OF COMPLIANCE

I hereby certify complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2007 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 9,339 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

s/ Charles A. Rothfeld
Charles A. Rothfeld

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2014, I electronically filed the foregoing brief with the Clerk of the Court for the United States court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. I further certify that I will cause eight (8) paper copies of this brief to be filed with the Court by overnight mail.

The participants in this case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

s/ Charles A. Rothfeld
Charles A. Rothfeld